### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

United States of America,                    Case No. 23-cr-93 (KMM/DJF)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Gregroy Devon Easley,

        Defendant.

This matter is before the Court on Defendant Gregroy Devon Easley's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion") (ECF No. 28).  Mr. Easley seeks to suppress all evidence obtained as the result of a search of his vehicle at a traffic stop on February 12, 2023 (*see* ECF No. 50).  He argues that the initial stop was pretextual and without a legal basis, and that even if the initial stop was lawful, it was unlawfully expanded into an investigatory stop and search of his vehicle without reasonable suspicion or probable cause. (*See generally id.*)  Because the Court finds both the initial stop and the search of Mr. Easley's vehicle lawful, it recommends denying the Motion.

### I.    Background

#### a.  February 12, 2023 Traffic Stop

Minnesota State Trooper Anthony Mains testified at the hearing on Mr. Easley's Motion. He stated that the encounter began while he was patrolling westbound I-94 in St. Paul, Minnesota in uniform in a marked vehicle at about 2:21 p.m. on February 12, 2023.  (ECF No. 39 at 7–9.)  Trooper Mains was driving in the right-most lane of traffic, with two lanes of traffic between his car and the left-most lane.  (*Id.* at 31.)  He testified that he noticed a Ford Edge

bearing Florida plates in the left-most lane, in which he observed the driver holding a cellphone with his right hand to his right ear, visibly engaging in a phone call and moving his lips. (*Id.* at 9–10, 31–32.) Because driving while manually using a cell phone with one's hands is a traffic violation in Minnesota, Trooper Mains dropped back, pulled his vehicle behind the Ford Edge, and turned on his lights to initiate a traffic stop. (*Id.* at 9–10.) The Ford Edge complied, stopping in a painted island right of the farthest right line of highway traffic, but left of an oncoming traffic ramp. (*See id.* at 33–34.)

Body-worn camera video footage of the encounter reflects that Trooper Mains approached the vehicle from the passenger side door. The footage also shows that when the driver—who turned out to be Mr. Easley—rolled down his window, multiple cell phones were visible, including: a red phone in Mr. Easley's left hand; another phone in his lap, which fell to the driver's side floorboard when Mr. Easley later reached for his wallet; and a third phone in the middle console cupholder. (Gov. Ex. 1:30–2:00.) There is a potential discrepancy in the record regarding exactly when Trooper Mains spotted the phone that fell. At the Motion hearing, Trooper Mains testified he saw three cell phones in the vehicle during the initial encounter: two that Mr. Easley "was operating … at the time, and … a third cell phone on the driver's side floorboard". (ECF No. 39 at 14–15.) However, in the body camera footage from the eventual search of the vehicle, Trooper Mains can be heard stating that Mr. Easley had "two more cellphones" when he saw Mr. Easley's phone on the driver's side floorboard, possibly suggesting he was only just then seeing that phone. (Gov. Ex. 2 at 23:40–23:45.) Trooper Mains also typed into his notes that he only saw two phones initially, but during the hearing he explained that must have been a typographical error, because he is certain he initially spotted three phones in plain view. (ECF No. 39 at 46–47.) Trooper Mains testified that, in his training and experience, the

use of multiple cell phones is often a hallmark of drug trafficking, as traffickers will often use one phone for personal use and other phones for illicit purposes. (*Id.* at 15.)

Trooper Mains also testified that he immediately noticed a strong odor of what appeared to be freshly sprayed air freshener from inside the vehicle.  (ECF No. 39 at 11.)  He also said he could see droplets of air freshener in the air of the vehicle. (*Id.*)  He stated that, in his training and experience, air freshener is often used to conceal the odor of recently consumed alcohol or the presence of contraband inside a vehicle.  (*Id.*)  Trooper Mains further testified he could smell marijuana over the air freshener during this initial encounter as the air freshener began to dissipate.[1] (*Id.* at 17.)    Mr. Easley admitted spraying air freshener in the car but testified he had sprayed it roughly five to seven minutes before the encounter with Trooper Mains because he had left food in the vehicle the night before. (ECF No. 47 at 37.)  Mr. Easley also testified that, although the scent of air freshener was present in the vehicle when Trooper Mains pulled him over, the smell of marijuana was not. (*Id.*)

During the initial encounter, Trooper Mains informed Mr. Easley he could not use his phone while driving because Minnesota is a hands-free state.  (*Id.* at 1:53–1:59.)  But Mr. Easley testified at the Motion hearing that he was not using his phone with his hands while driving; instead, the phone was in his lap on speaker phone.  (ECF No. 47 at 23–25.)  He also said the red phone in his left hand when Trooper Mains arrived had been in his front hoodie pocket, and that he took it out after he was stopped to record the encounter. (ECF No. 24–25.)  Mr. Easley further stated that he did not understand what Trooper Mains meant when he said Minnesota is a hands-free state. (ECF No. 47 at 41–42.)

---

[1] Trooper Mains testified that he has training in marijuana identification and has encountered the drug in both its burnt and dry forms "almost … thousands" of times in his career. (ECF No. 39 at 16.)

Trooper Mains initiated the encounter by requesting Mr. Easley's license and registration and asking whether Mr. Easley was from the area.  (Gov. Ex. 2 at 1:35–1:46.)  Mr. Easley said he lived in the area and that the car was a rental.  He began reaching for his wallet when the phone in his lap fell to the floor. (*Id.* at 1:46–1:53.)  Upon learning the car was a rental, Trooper Mains asked for the rental agreement.  Mr. Easley showed Trooper Mains the agreement on one of his cell phones, establishing that the car was a long-term rental from the Minneapolis-St. Paul airport. (Gov. Ex. 2 at 2:03–3:30; ECF No. 39 at 13.)  Trooper Mains testified that, in his experience, a local individual using a long-term rental vehicle was often a sign of drug trafficking, since rentals can be swapped easily to avoid law enforcement surveillance.  (ECF No. 39 at 13.)

Trooper Mains testified that throughout the encounter he believed Mr. Easley was evasive and grew increasingly nervous.  He asked Mr. Easley whether his regular vehicle was in a repair shop and received an inaudible response, needing to repeat the question a second time. (Gov. Ex. 2 at 2:55–3:05.)  Eventually Mr. Easley explained that sometimes his girlfriend uses his regular vehicle. (ECF No. 39 at 14.)  Though the road noise appears to have been loud, and it is entirely plausible Mr. Easley simply did not hear the question, Trooper Mains said he believed Mr. Easley understood the question the first time and did not answer immediately because he was trying to come up with an explanation for why he was using a rental vehicle. (*Id.*)  Trooper Mains also said he noticed Mr. Easley getting more nervous, and that he saw Mr. Easley's stomach "pulsating", indicating a possible elevated heart rate. (*Id.*)

After reviewing Mr. Easley's license and the rental agreement, Trooper Mains told Mr. Easley to "sit tight" and returned to his squad car to run Mr. Easley's information in the car's computer. (Gov. Ex. 2 at 3:35–3:50.)  He learned of Mr. Easley's prior arrests for "homicide,

weapons offenses" (*id.* at 8:00–8:10), and his prior conviction for "second degree riot armed with a dangerous weapon" (*id.* at 11:13–11:20).

While Trooper Mains was running Mr. Easley's information through the computer, Trooper Nelson arrived at the scene. (*Id.* at 7:50–8:00.) Trooper Mains told Trooper Nelson he was going to pull Mr. Easley out of the vehicle and noted Mr. Easley's prior arrest record. (*See id.* at 8:00–8:10, 11:13–11:20.) He expressed concern, in view of these arrests, about whether Mr. Easley might have a gun in the car. (*Id.* at 11:35–11:40.)

While the Troopers debated how best to safely get Mr. Easley out of his vehicle in the midst of oncoming traffic, Trooper Mains discussed the possibility of using his K-9 to conduct a search, stating "I mean I smell marijuana over the air freshener[.]" (*Id.* at 9:25–9:35.) Trooper Mains then approached the car for the second time and asked Mr. Easley to step out. (*Id.* at 11:50–12:05.)

Mr. Easley points out that, as shown in post-search video footage, Officer Mains told BCA Agent Michael Flanagan, "[H]e just sprayed fresh air freshener … [I] went back, ran his … crim[inal] history, he's got a bunch of weapons offenses, came back, air freshener kind of dissipated, and it smelled like weed and I asked him to step out," suggesting Trooper Mains did not detect the smell of marijuana until *after* he told Trooper Nelson he had already decided to conduct the vehicle search. (*Id.* at 35:58–36:13.) Trooper Mains attributed this seeming discrepancy to the informal and quick nature of his interaction with Agent Flanagan. (*See* ECF No. 39 at 63–64.)

When Mr. Easley got out of the car Trooper Mains immediately asked Mr. Easley whether there was any weed in the vehicle, which Mr. Easley denied. (Gov. Ex. 2 at 14:45–15:00.) Trooper Mains explained that he smelled air freshener when he first walked up to the

car, but Mr. Easley denied this, stating he did not spray any air freshener and that "it could probably be [his] cologne" because he does not smoke marijuana at all. (*Id.* at 15:00–15:10.) This denial is inconsistent with Mr. Easley's testimony admitting his car did smell of air freshener. (ECF No. 47 at 36–37.) Trooper Mains again repeatedly asked Mr. Easley to confirm whether there would be any marijuana or other drugs in the car, which Mr. Easley emphatically denied. (*Id.* at 15:05–15:15; 15:30-15:50.) Trooper Mains expressed clear doubt about this. (*See id.* at 15:15–15:20, stating he "[swore] to God" he smelled marijuana in the car.) Trooper Mains asked whether somebody else may have smoked marijuana in the car recently, which Mr. Easley also emphatically denied, stating "nobody smokes around [him], nobody smokes with [him]—none of that, like none of that at all." (*Id.* at 15:20–15:28.) When asked to identify which items in the vehicle belonged to him, Mr. Easley identified the phones, his wallet, a backpack, and a pair of shoes in the backseat. (*Id.* at 15:50–16:18.)

Trooper Mains further testified that as he was speaking with Mr. Easley he noticed a large wad of rubber-banded cash in Mr. Easley's pocket. (*Id.* at 21.) He said he could see that the bulge in Mr. Easley's pocket was a wad of cash because it was poking out in plain view. (*Id.* at 21–22.) Trooper Mains testified that, in his experience, large amounts of rubber-banded cash are commonly associated with narcotics trafficking. (*Id.* at 22.)

Trooper Mains testified that he decided to search Mr. Easley's vehicle based on the totality of the circumstances, including the multiple cell phones, the rental agreement, Mr. Easley's criminal history, the smell of air freshener and marijuana emanating from the car, and Mr. Easley's nervous behavior. (ECF No. 39 at 19.) During Trooper Mains found two large wads of rubber-banded cash in the middle console amounting to roughly $10,000. (*Id.* at 17:15–18:00; ECF No. 39 at 24.) He then searched Mr. Easley's backpack, which was on the right rear

passenger seat.  Based on the video footage, the backpack appears to have been visibly open by roughly two to three inches (Gov. Ex. 2 at 18:00–18:02).  When Trooper Mains searched the backpack, he found 19 3.5-gram packaged bags of marijuana with cartoon logos on them.  (Gov. Ex. 2 at 17:50–18:15; Gov. Ex. 5; ECF No. 39 at 24–25.)

Trooper Mains then approached Mr. Easley again.  Trooper Mains told Mr. Easley he found marijuana in the car, but Mr. Easley denied any knowledge of the marijuana in the backpack or the money in the middle console. (Gov. Ex. 2 at 18:15–19:10.)  Trooper Mains informed Mr. Easley he would be detained but was not under arrest, since the quantity of marijuana did not appear to support a felony charge.  (*Id.* at 19:10–19:25.)  Trooper Mains then conducted a pat-search, retrieving the large wad of rubber-banded cash from Mr. Easley's left pocket. (*Id.* at 20:10–21:10.)  Trooper Mains asked Mr. Easley to sit in the back of the squad car and placed the cash in an evidence bag.  (*Id.* at 20:10–23:00.)

Though Mr. Easley denied knowledge of the marijuana in response to Trooper Main's questioning, during testimony proffered at the Motion hearing he admitted knowledge and responsibility for it.  Mr. Easley specifically testified that he put the packages of marijuana in the backpack before he left home around noon on the day of the stop.  (ECF No. 47 at 39.)  Mr. Easley denied that the marijuana in the backpack emitted an odor that Trooper Mains could have detected, however.  (*Id*. at 52.)  Mr. Easley testified the packets of marijuana had been in the backpack for only about an hour-and-a-half to two hours before the traffic stop.  (ECF No. 47 at 39.)  He also testified he purchased the packaging online from a company that advertised the packaging as smell-proof mylar bags.  (ECF No. 47 at 29–31; Def. Ex. 8–9.)  Mr. Easley proffered additional evidence during the Motion hearing that the backpack was advertised as smell-proof—capable of locking in "all smells, even really strong danky odors"—with a

"proprietary six-layer design, including a general layer activated carbon, sandwiched between two layers of filter fabric, a waterproof foil layer of naturally durable burlap, [and]… lockable silicone gasketed double zippers." (ECF No. 47 at 32, 34-36; Def. Ex. 10.)    Neither party conducted any testing on these products to confirm the veracity of the advertised "smell-proof" claims.

After placing Mr. Easley in the back of the squad car, Trooper Mains and Trooper Nelson completed the search of Mr. Easley's car.  During the search, the troopers discovered a container of air freshener in the driver's side door.  (*See* ECF No. 39 at 27; Gov. Ex. 7.)  They also found a Glock 27 pistol on the floor of the front driver's side seat with an altered serial number and an auto-sear 'switch' rendering the weapon fully automatic. (Gov. Ex. 2 at 24:00–24:40; Gov. Ex. 6; ECF No. 39 at 26–27.)  Upon finding the pistol, the troopers placed Mr. Easley in handcuffs under arrest (Gov. Ex. 2 at 25:50–27:00) and called BCA Agent Flanagan to the scene.

### b. Expert Testimony

#### i. BCA Agent Michael Flanagan

The Government called BCA Agent Michael Flanagan to testify as an expert witness during the Motion hearing.  Agent Flanagan is a drug task force officer with drug identification training. He testified about marijuana identification and the common means individuals use to attempt to conceal its smell. (*See* ECF No. 39 at 66; Gov. Ex. 9.)  Agent Flanagan explained that 15-20 years ago, the marijuana that law enforcement officers encountered fell into two general buckets. (ECF No. 39 at 69.)  The first was what they called "low-grade" or "ditch weed." (*Id.*) This marijuana was often compressed, dense, less odorous and heavy. (*Id.*)  The second, which they referred to as "bud", was higher-grade, flowery, more odorous, and light.  (*Id.* at 69–70.)

Today, however, officers rarely encounter the low-grade marijuana, and nearly all of the marijuana in circulation is the flowery, odorous, high-grade variety. (*Id.*)

Agent Flanagan testified that, in his experience, a "trace amount" of resin or particles from marijuana in a vehicle can be enough for the smell to be prevalent. (*Id.* at 71–72.) He explained that he has often encountered drug traffickers using sealed bags in an attempt to hide or mask the odor of marijuana. (*Id.* at 72.) In his experience, however, this is ineffective most of the time, because it is easy to get resin or particles on the exterior of the packaging that carry the plant's odor. (*Id.* at 72.) He also testified that food-saver style bags, even if double or triple sealed, often allow smell to permeate, whether it be through the bag or due to resin or particles on the exterior of the bag. (*Id.* at 72–73.) According to Agent Flanagan, cross-contamination is common. He stated that when he has visited marijuana growing or packaging locations in the past, he noticed the pungent odor of marijuana on his clothes upon leaving. (*Id.* at 73–74.) He also testified that, in his experience, items that are advertised as smell-proof often are not actually smell-proof. He said he has been involved in multiple operations during which marijuana packaged in purportedly smell-proof containers or bags was detected by smell. (*Id.* at 76.) Agent Flanagan agreed, however, that the odor of legal hemp and illegal marijuana can be indistinguishable. (*Id.* at 78.)

### ii.  Dr. George Weiblen

Mr. Easley called Dr. George Weiblen to testify as an expert in his defense. Dr. Weiblen is a professor of botany and genetics at the University of Minnesota. He is also the science director and curator of plants at the Bell Museum, with twenty years of research experience studying cannabis. (*See* ECF No. 47 at 4–6; Def. Ex. 7.) Dr. Weiblen testified that there is no difference between the smell of illegal marijuana and legal hemp, whether in raw or burnt forms.

(ECF No. 47 at 9.)  He stated he is aware of people using legal, hemp-based CBD cigarettes for ailments such as chronic pain or insomnia.  (*Id.* at 9–10.)

Dr. Weiblen also testified that merely walking through a lab or marijuana growing facility will not result in the smell attaching to one's clothes.  (*Id.* at 13.)  However, if a person touches the plant material the resin will end up on their hands, and if the person then touches their clothes the smell can stick to the clothing.  (*Id.*)  Dr. Weiblen said he has never had a reason to attempt to contain the smell of the plant, though.  (*Id.* at 14.)  The researchers in Dr. Weiblen's studies use Uline Ziploc bags to contain the marijuana plant material, and he noted that if the bags are not fully sealed, or if there are any holes in the bags, the smell could emanate into the environment.  (*Id.* at 14–16.)  Dr. Weiblen testified, consistent with Agent Flanagan, that the 'high-grade' strains of marijuana that have become more prevalent over the years are more resinous and odorous.  (*Id.* at 10–11.)  He noted, however, that the same increase in resin and odor also occurs in high-grade legal hemp. (*Id.* at 11.)

## II.    Analysis

Mr. Easley's suppression argument is multifaceted.  First, he argues Trooper Mains' proffered justification for initiating the traffic stop was pretextual.  (ECF No. 50 at 8–9.)  Mr. Easley contends his cellphone was in his lap on speaker phone and that he was not using it with his hands as Trooper Mains claims.  He further argues that, even if he was using the phone with his hands, it would have been impossible for Trooper Mains to see his mouth moving because his hand and forearm would have blocked his mouth from Trooper Mains' view.  Mr. Easley thus asserts Trooper Mains' testimony is not credible and that he was lying. (*Id.*)

Second, Mr. Easley argues that, even if the initial stop was lawful, Trooper Mains unlawfully expanded the scope of the traffic stop into an investigatory stop.  He contests the

credibility of Trooper Mains' testimony regarding the smell of air freshener, the fact that Mr. Easley was driving a long-term rental vehicle, his multiple cell phones, and his purported nerves, and argues these factors did not provide Trooper Mains with sufficient reasonable suspicion of drug-related activity to question Mr. Easley and continue the duration of the stop. (*Id.* at 10–24.)

Third, Mr. Easley argues Trooper Mains lied about smelling marijuana. (*See id.* at 24–33.) Mr. Easley argues that, accordingly, even if Trooper Mains had a lawful basis to detain and question him, Trooper Mains did not have probable cause to search the vehicle for marijuana. (*Id.*)

Finally, Mr. Easley points out that hemp was legal at the time of the stop and that the smell of marijuana is indistinguishable from the smell of hemp. Mr. Easley contends that, even if Trooper Mains did smell marijuana in the car, the smell of the plant alone cannot constitute probable cause to support a vehicle search. (*Id.* at 34–39.)

The gravamen of Mr. Easley's argument is that Trooper Mains proffered perjured testimony at the Motion hearing in order to justify the search. Although the Court is not naïve to the possibility that a law enforcement officer might purposefully misrepresent the facts to protect an indictment, the Court is not persuaded that is what happened here. For the reasons given below, the Court concludes Trooper Mains had a lawful basis to stop and question Mr. Easley and probable cause to search the vehicle based on the totality of the circumstances.

### a.   The Initial Traffic Stop

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "Under the Fourth Amendment, a traffic stop is

reasonable if it is supported by either probable cause or an articulable reasonable suspicion that a traffic violation has occurred." *United States v. Rederick*, 65 F.4th 961, 965 (8th Cir. 2023) (quoting *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Rederick*, 65 F.4th at 965 (quoting *United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006)). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007). "To determine whether reasonable suspicion exists, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Rederick*, 65 F.4th at 965 (internal quotations and citations omitted). It is the Government's burden to establish, based on the preponderance of evidence, probable cause or reasonable suspicion. *See United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006).

Trooper Mains claims he stopped Mr. Easley for driving in violation of Minnesota Statute 169.475, which makes it illegal for a driver to engage in a cell phone call while operating a motor vehicle unless the cell phone is used solely in voice-activated or "hands-free" mode. The Court finds Trooper Mains' testimony on this point credible. Mr. Easley's attempts to discredit Trooper Mains' testimony are threefold. First, he argues that the fact one of his cell phones was visibly in his lap when Trooper Mains approached his window supports his version of events (ECF No. 50 at 9). However, this fact could equally support Trooper Mains' version of events. If the phone was in Mr. Easley's right hand when Trooper Mains pulled him over, he would have needed to put the phone down to use his right hand to put the car in park, rendering the fact the phone was in his lap perfectly consistent with Trooper Mains' version of events. The video

supports this possibility, as both middle console cup holders are occupied—one spot by one of Mr. Easley's other phones and the other by a water bottle—making his lap a natural place for him to have put the phone down under the circumstances. (*See* Gov. Ex. 2 at 1:40–1:45.)

Mr. Easley's second argument is that it would have been impossible for Trooper Mains to see Mr. Easley's mouth moving because Trooper Mains was driving to the right of Mr. Easley's vehicle, and Trooper Mains testified Mr. Easley was holding the cell phone with his right hand. According to Mr. Easley's counsel, the "most natural" way to hold a cell phone would have blocked Trooper Mains' ability to see Mr. Easley's mouth (ECF No. 50 at 9).    The Court disagrees.    There was nothing natural about the hand and arm posture Mr. Easley's counsel demonstrated at the Motion hearing, which he argues necessarily would have blocked the entirety of Mr. Easley's mouth from Trooper Mains' view.    And even if Mr. Easley was holding his arm in that unnatural posture, given that both vehicles were moving, it is likely Trooper Mains would have been able to see Mr. Easley's mouth at some angle while driving alongside Mr. Easley.    Moreover, whether Trooper Mains actually saw Mr. Easley's lips moving or not, his testimony that he saw Mr. Easley driving with a phone to his ear is sufficient to establish reasonable suspicion that Mr. Easley was violating Minnesota's hands-free law. *See Rederick*, 65 F.4th at 965.

Finally, the body-worn camera footage undermines Mr. Easley's argument that Trooper Mains is lying (*see* ECF No. 50 at 9).    Trooper Mains' admonition to Mr. Easley, "We can't be on our phone while driving; it's a hands-free state[,]" appears genuine, and Mr. Easley does not appear to contest this on the video.    (Gov. Ex. 2 at 1:53–2:00.)    In light of the foregoing and given that Mr. Easley had three cell phones within arms' reach when Trooper Mains pulled him over, the Court finds the rationale offered for the traffic stop was not pretextual.

### b. The Investigatory Stop

Though a traffic stop initially may be lawful, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable searches and seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 354). During a routine traffic stop for an alleged traffic violation, "an officer may detain the occupants of a vehicle … 'while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation,' including running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their 'destination, route, and purpose.'" *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (citations omitted)). A police officer may not extend an otherwise completed traffic stop without reasonable suspicion. *Rodriguez*, 575 U.S. at 353–54. However, a routine traffic stop can lawfully evolve into an investigatory stop when an officer develops reasonable suspicion of drug-related activity while completing the tasks normally associated with a traffic stop. *Murillo-Salgado*, 854 F.3d at 416.

The Court concludes that, during the course of the traffic stop, Trooper Mains developed sufficient reasonable suspicion of drug-related activity to warrant extending the initial traffic stop into an investigatory stop because, within the first few minutes of Trooper Mains' and Mr. Easley's interaction:  three cell phones were visibly present; the car smelled of air freshener; the

car was identified as a long-term rental vehicle; and a reasonable officer could have perceived Mr. Easley's delayed response as to why he was driving a long-term rental vehicle suspicious. In addition, as the air freshener dissipated, the car began to smell of marijuana. These factors provided sufficient justification for Officer Mains to subject Mr. Easley to further questioning about whether drugs would be found in the car.

First, it is immediately apparent from the body-worn camera footage that Mr. Easley was in possession of multiple cell phones, which Trooper Mains testified in his experience can be indicative of criminal conduct. (ECF No. 39 at 14–15); *see also, e.g.*, *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) ("[D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection.") While there is some inconsistency between Trooper Mains' testimony and his notes regarding whether he saw two or three cell phones during his initial encounter with Mr. Easley, the fact remains that under either version of events, multiple cell phones were in Trooper Mains' immediate view upon approaching the car. (Gov. Ex. 2 at 1:40–2:00.) Any discrepancies can be attributed to the fact that the cell phone initially in Mr. Easley's lap fell onto the driver's side floorboard when he was reaching for his wallet (*id.* at 1:40–1:50), making it reasonable for Trooper Mains to be confused about the number of phones and whether the phone he later found on the floor was a new phone or the same phone initially visible in Mr. Easley's lap.

Another indicator of possible drug trafficking was that Mr. Easley is a Minnesota resident who was driving a long-term rental vehicle. Trooper Mains testified that using a long-term rental is a sign of possible drug trafficking, since traffickers often will use rental vehicles to avoid law enforcement surveillance. (ECF No. 39 at 13); *see also, e.g.*, *United States v. Brtek*, No. 20-CR-79 (DWF/TNL), 2021 WL 773029, at *10 (D. Minn. Jan. 20, 2021) (crediting an officer's

testimony that, in his experience, rental vehicles are often used in drug trafficking), *report and recommendation adopted*, 2021 WL 766855 (D. Minn. Feb. 26, 2021). Further compounding Officer Mains' suspicion was that Mr. Easley did not immediately respond to Trooper Mains' inquiry about why he was driving a rental vehicle. (ECF No. 39 at 14; Gov. Ex. 2 at 2:50–3:10.) Though it very well may be true that Mr. Easley could not hear Trooper Mains due to the road noise, a reasonable officer under the circumstances could have perceived Mr. Easley's delayed response as suspicious enough to at least warrant further questioning. *See United States v. Salamasina*, 615 F.3d 925, 930 (8th Cir. 2010) (noting that the reasonable suspicion inquiry is done from the perspective of an objective officer presented with the facts and circumstances at issue); *see also United States v. Suitt*, 569 F.3d 867 (8th Cir. 2009) (finding evasive and incomplete answers gave reasonable suspicion to prolong a stop).

A third indicator of possible drug trafficking was the odor of air freshener immediately detectible when Trooper Mains first approached the passenger-side window. Trooper Mains testified that, in his experience, air freshener is often used to mask the smell of drugs. (ECF No. 39 at 11.) While Mr. Easley disputes Trooper Mains' inference—based on the alleged droplets in the air—that Mr. Easley sprayed the air freshener just before Officer Mains approached his car, he admits using it earlier in the day and that the car did smell of air freshener. (ECF No. 39 at 11–12; ECF No. 47 at 36–37.) The air freshener odor in the car thus contributed to Officer Mains' reasonable suspicion. *See, e.g.*, *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (finding reasonable suspicion existed to extend a traffic stop based, in part, on the vehicle's "strong odor of air freshener"); *United States v. Noriega*, 35 F.4th 643, 650 (8th Cir. 2022) (affirming a finding of reasonable suspicion based, in part, on the officer's testimony that a

"strong fragrance was coming from Noriega's vehicle at the outset of the stop but dissipated over the stop's duration").

Finally, as discussed in greater detail below, the Court finds credible Trooper Mains' testimony that he smelled marijuana during his initial encounter with Mr. Easley.   The combination of these factors was more than sufficient to establish reasonable suspicion to expand the scope of the stop from a routine traffic stop into an investigatory stop.  *See, e.g., United States v. Pena-Ponce*, 588 F.3d 579, 584 (finding extreme nervousness, multiple cell phones and inconsistent stories generated reasonable suspicion); *United States v. Billings*, 15-cr-13 (BLG/SPW/CSO), 2015 WL 9917225, at *4–*5 (D. Mont. Dec. 24, 2015) (finding reasonable suspicion existed to extend a traffic stop, in part, because there were multiple phones and air fresheners in the vehicle, the vehicle was a rental, and the driver provided a suspicious explanation to one of the officer's questions), *report and recommendation adopted*, 2016 WL 323556 (D. Mont. Jan. 26, 2016).

### c.  The Vehicle Search

An officer who expands a traffic stop into an investigatory stop without the subject's consent must have probable cause to conduct a warrantless search of the subject's vehicle. *Murillo-Salgado*, 854 F.3d at 418. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013).  Here, the Court finds Trooper Mains had probable cause to search the vehicle by the time he conducted the search, based on: each of the above-described indicators of potential drug activity; the cash in plain view in Mr. Easley's pocket; Mr. Easley's implausible explanation for why his car smelled of air freshener; and the smell of marijuana, *see*

17

*United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) ("This court has held numerous times that the smell of marijuana coming from a vehicle during a proper traffic stop gives an officer probable cause to search for drugs.") (citations omitted).

While Mr. Easley admits he had a large wad of cash in his pocket at the time of the incident, he disputes whether Trooper Mains could have seen it.  Trooper Mains testified that a wad of rubber-banded cash was visible in Mr. Easley's pocket after Mr. Easley exited the vehicle and that, in Trooper Mains' training and experience, this was a sign of drug-trafficking due to the cash-only nature of the illegal drug trade. (ECF No. 39 at 21–22); *see also, e.g.*, *United States v. $12,390 in U.S. Currency*, 956 F.2d 801 (8th Cir. 1992) ("[T]he money seized from the residence was wrapped in rubber bands, which, according to the unimpeached testimony of narcotics officers, is characteristic of the way drug money is stored.")  Mr. Easley claims the camera footage establishes that Trooper Mains could not have seen the wad of cash in his pocket.  But to the contrary, the video supports Trooper Mains' contention that he spotted a wad of cash in Mr. Easley's pocket, showing Trooper Mains asking Mr. Easley if he had anything else in his pockets *other than cash*. (Gov. Ex. 2 at 16:15–16:20.)  Because the video record substantiates Trooper Mains' claim that he saw a wad of cash in Mr. Easley's pocket, the Court credits that testimony and finds the cash, along with all of the other factors discussed herein, as contributing to probable cause for the search.

Moreover, while Mr. Easley admitted during his testimony that he had used air freshener in the car, he lied to Trooper Mains about it during the stop—outright denying that the car could have smelled of air freshener and implausibly attempting to attribute the smell to his cologne. (*Compare* ECF No. 47 at 36–37, *with* Gov. Ex. 2 at 14:50–15:10.)  A reasonable police officer in Trooper Mains' position would have been able to distinguish the smell of air freshener from the

smell of cologne. The implausibility of Mr. Easley's explanation further supports a finding of probable cause to search the vehicle. *See, e.g.*, *United States v. McCoy*, 200 F.2d 582, 584 (8th Cir. 2000) (finding probable cause to search a vehicle, in part, because of the strong odor of air freshener); *Devenpeck v. Alford*, 543 U.S. 146, 149, 155–56 (2004) (noting that a suspect's "untruthful and evasive" answers to police questioning could support probable cause).

With respect to the last factor—the smell of marijuana—Mr. Easley contends it would have been impossible for Trooper Mains to smell the marijuana in his vehicle because it was inside 19 individual smell-proof bags, which were themselves stored inside a smell-proof backpack. But regardless of whether the backpack was capable of masking "strong danky odors"—a contention that neither party has tested—it is apparent from the camera footage that the backpack was unzipped by several inches, rendering whatever smell-proof properties the backpack might have had largely useless. (Gov. Ex. 2 at 18:00–18:02.) Moreover, the Court is skeptical of Mr. Easley's claim that the packages were smell-proof based solely on the untested and unsubstantiated advertising claims of the online retailer that sold them to Mr. Easley. (*See* ECF No. 50 at 6, arguing the bags are smell-proof based on the advertising and sales claims shown at Def. Ex. 9; *see also* ECF No. 39 at 76, testimony from Agent Flanagan that products advertised as "smell-proof" often do not live up to these claims). And even if the individual bags were smell-proof, the parties' experts agreed that marijuana odor may have emitted from resin inadvertently transferred to the outside of the bags, the backpack, or elsewhere in the vehicle. (*See* ECF No. 39 at 72–73, Agent Flanagan's testimony that resin on the outside of packaging can emit the smell of marijuana; ECF No. 47 at 16, Dr. Weiblen's testimony that bags which are not fully sealed, and skin or clothing to which resin attaches, can smell of marijuana). For these

reasons, the Court is unpersuaded by Mr. Easley's claims or the expert testimony that it was impossible for Trooper Mains to have smelled the marijuana later discovered in Mr. Easley's car.

The Court also finds Trooper Mains' testimony that he began to smell marijuana *before* he searched the car to be credible.  While the body-worn camera footage is arguably unclear about precisely when Trooper Mains first smelled marijuana in the car, it supports Trooper Mains' contention that he smelled marijuana at some point before the search began.  (*Compare* Gov. Ex. 2 at 9:25–9:35, statement to Trooper Nelson, based solely on the initial encounter, suggesting Trooper Mains smelled marijuana over the air freshener, *with* Gov. Ex. 2 at 35:58– 36:13, statement to Agent Flanagan suggesting Trooper Mains smelled marijuana during the second encounter, just before he asked Mr. Easley to step out of the car.)

Mr. Easley points to this possible discrepancy in timing as grounds for discrediting Trooper Mains' testimony entirely, but the Court disagrees.  Both of Trooper Mains' statements are consistent with his testimony that the smell of marijuana was detectible during the first encounter, but that it was much stronger during the second encounter as the air freshener began to dissipate.  (ECF No. 39 at 15, 18.)  Moreover, Trooper Mains' testimony is heavily bolstered by the fact that he repeatedly questioned Mr. Easley about whether a search of the car would disclose marijuana, or whether someone had previously smoked marijuana in the car.  (Gov. Ex. 2 at 14:45-15:28; *see also id.* at 15:15–15:20, swearing "to God" that he smelled marijuana in the vehicle.)   Because Trooper Mains credibly testified he smelled marijuana in the car before he began the search, and based on the cash in Mr. Easley's pocket, Mr. Easley's questionable explanation for why his car smelled of air freshener, and the other indicia of drug trafficking addressed above, the Court finds the search was supported by probable cause.

Having reached this conclusion, the Court briefly addresses Mr. Easley's final argument: that because hemp products are legal in Minnesota and legal hemp has an indistinguishable odor from that of illegal marijuana, the smell of marijuana cannot support probable cause to search a vehicle.[2]  Prior court rulings have rejected this argument in various forms on multiple occasions. *See United States v. Wells*, No. 22-cr-99 (PJS/ECW), 2023 WL 3098746, at *7–*8 (D. Minn. Mar. 23, 2023) (quoting *State v. Grissom*, No. A21-1540, 2022 WL 1920680, at *3–*4 (Minn. Ct. App. June 6, 2022), *rev. denied* (Minn. Aug. 9, 2022)), *report and recommendation adopted*, 2023 WL 3094631 (D. Minn. Apr. 26, 2023); *United States v. Estes*, 21-cr-0223 (PJS/LIB), 2022 WL 683091, at *1 (D. Minn. Mar. 8, 2022); *United States v. Nava*, 22-cr-20002-PKH-1, 2022 WL 3593724, at *7 (W.D. Ark. Aug. 1, 2022), *report and recommendation adopted*, 2022 WL 3589493 (W.D. Ark. Aug. 22, 2022); *see also United States v. Williams*, 955 F. 3d 734, 737 (8th Cir. 2020) ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle[.]") (citations omitted).  The Court finds no reason to deviate from these precedents based on the theoretical, but unlikely, possibility that the odor Trooper Mains detected might have been hemp.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Mr. Easley's Motion to Suppress Search and Seizure (ECF No. 28) be **DENIED**.

Dated: August 15, 2023

*s/ Dulce J. Foster*
Dulce J. Foster
United States Magistrate Judge

---

[2] The Court notes that, while recreational marijuana use is now legal under Minnesota state law, it was not legal during the relevant time period.

<u>**NOTICE**</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).