# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                                            No. 23-CR-93 (KMM/DJF)

                                Plaintiff,

v.                                                                                    **ORDER**

Gregory Devon Easley,

                                Defendant.

Minnesota State Trooper Anthony Mains stopped a vehicle driven by Gregory Devon Easley for a routine traffic violation. After his initial observations of the vehicle and Mr. Easley and a brief review of Mr. Easley's documents and criminal history, Trooper Mains ordered Mr. Easley from the vehicle, which he then searched. On the back seat, Trooper Mains found and opened a backpack, which contained many small packages of marijuana. And in the front center console, Trooper Mains found two large stacks of cash. Mr. Easley denied these items were his and was placed in the back of Trooper Main's squad vehicle as Trooper Mains returned to continue the search of Mr. Easley's car. Trooper Mains then located a modified handgun, capable of automatic firing, under the driver's seat of Mr. Easley's vehicle. Trooper Mains arrested Mr. Easley and the government later indicted him for being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8).

Mr. Easley filed a motion to suppress the evidence obtained from the vehicle, arguing that Officer Mains' stop and subsequent search of the vehicle violated his Fourth Amendment rights. ECF 28. On May 11, 2023, United States Magistrate Judge Dulce J. Foster conducted the first of two evidentiary hearings on Mr. Easley's motion. Transcript at ECF 39. A second hearing was held on May 31, 2023. Second Transcript at ECF 47. These hearings included fact testimony about the stop and the search of Mr. Easley's vehicle, as well as expert testimony concerning the odors produced by marijuana compared with other, lawful hemp-based cannabis products. During both hearings, the Court received exhibits from the government and the defense.

After post-hearing briefing, Judge Foster issued a Report and Recommendation ("R&R") containing proposed findings of fact and conclusions of law regarding Mr. Easley's motion. ECF 54. Judge Foster recommends that the motion be denied. Mr. Easley filed timely objections on August 29, 2023. Objections, ECF 56. For the reasons that follow, the R&R is accepted and the motion to suppress evidence is denied.

## I.    Background

The Court has reviewed the R&R's factual findings as well as the evidence upon which those findings are based. The Court finds the R&R's recitation of the facts to be well-supported by the record. However, the Court will summarize the relevant facts here, based on its own *de novo* review of the record and evidence.

### A. Traffic Stop

On February 12, 2023, Trooper Mains was on patrol heading westbound on Interstate 94 in St. Paul, Minnesota. ECF 39 at 7. Trooper Mains testified that, from his

position in the right lane of traffic, he observed a Ford SUV with Florida license plates in the far-left lane. *Id.* at 9. Trooper Mains testified that he observed the driver of the Ford, holding a cell phone to his right ear with his right hand, while moving his lips as though speaking into it. *Id.* Holding and operating a cell phone while driving is a traffic violation in Minnesota. Minn. Stat. § 169.475. Trooper Mains testified that he slowed down, pulled behind the Ford, and activated his lights to initiate a stop. ECF 39 at 10. The Ford pulled over and came to a stop. *Id*. At this point, Trooper Mains' body-worn camera ("bodycam") shows that he exited his vehicle and approached the Ford's passenger-side door, where he spoke to the driver and sole-occupant of the vehicle, Mr. Easley. Gov't's Ex. 2 at 1:20. After requesting Mr. Easley's license and registration, Trooper Mains asked Mr. Easley if he was "from here," *id.* at 1:45, and then stated that "we can't be on our phone while we're driving—it's a hands-free state," *id.* at 1:52. Upon learning from Mr. Easley that the Ford was a rental, Trooper Mains asked for the rental agreement, and then asked Mr. Easley whether his car was in the shop. *Id.* at 2:50–3:10.

After receiving the requested documents, Trooper Mains returned to his vehicle to review them and to obtain additional information from his squad car computer. *Id.* at 3:45. Trooper Mains typed into his squad vehicle's computer that he had observed: a "strong odor" of air freshener in the Ford, two cell phones, and a "slight odor" of marijuana. *Id.* at 7:45. When a second highway patrol officer, Trooper Nelson, arrived at the scene, Trooper Mains told him about Mr. Easley's criminal record and stated he was contemplating "the best way to get him out" of the Ford, given its parked position between the highway and an onramp. *Id.* at 8:00–9:20. Trooper Mains also Trooper

Nelson that he smelled marijuana under the air freshener. Finally, Trooper Mains made a comment about Mr. Easley's recent arrest for second-degree armed riot and then stated: "I wonder if there will be a gun in there." *Id.* at 11:15–11:39.

**B. Continued Encounter**

Trooper Mains reapproached the Ford and told Mr. Easley he wanted to speak with him outside. *Id.* at 12:00. Although Mr. Easley's side of the conversation is difficult to hear, it is clear that Mr. Easley did not initially wish to leave the vehicle. *Id.* at 12:00–13:00. He expressed his concerns about his rights and his safety. *Id.* Officer Mains eventually ordered Mr. Easley from his vehicle, after assuring Mr. Easley that he would be safe, saying "I'm not going to touch you unless you give me a reason to touch you." *Id.* at 13:10–14:20. Mr. Easley complied. *Id.* at 14:45. Now standing beside the highway, Trooper Mains asked Mr. Easley if there was "any weed in the car" and Mr. Easley repeatedly answered no. *Id.* at 14:55. He was adamant that there was no marijuana in the car. Trooper Mains explained that he had smelled air freshener, which Mr. Easley attributed to being possibly his cologne. *Id.* at 15:00–15:10. Trooper Mains then again asked Mr. Easley about the presence marijuana, saying, "because when I walked up there, I swear to God I smelled it." *Id.* at 15:15. Once more, Mr. Easley denied that any marijuana was present. *Id.* at 15:20. Trooper Mains then asked Mr. Easley whether there were other types of drugs or a weapon in the Ford, which Mr. Easley also denied. *Id.* at 15:50. Trooper Mains asked if a backpack in the backseat belonged to Mr. Easley, who said it did. *Id.* at 16:02. Mr. Easley denied that Trooper Mains would find anything illegal in the backpack. *Id.* at 16:05.

4

At this point, Trooper Mains revealed that he intended to "take a quick peek" in the Ford and asked Mr. Easley to wait by his squad vehicle. *Id.* at 16:15. Mr. Easley pushed back, stating his belief that his vehicle was being searched unfairly because Trooper Mains had smelled air freshener., and he denied that Trooper Mains had ever mentioned smelling marijuana. Trooper Mains repeated his earlier statement that he had also smelled marijuana and again asked Mr. Easley to stand by the squad vehicle with Trooper Nelson. *Id.* at 17:05. Mr. Easley complied. *Id.* at 17:10.

### C. First Search

With Mr. Easley now waiting beside Trooper Mains' squad vehicle, Trooper Mains returned to the Ford alone and opened the front, passenger door. He first inspected the glovebox but found nothing of apparent interest. *Id.* at 17:25. He then inspected the center console, where he found two stacks of cash, bound by rubber bands, which he placed on the front passenger seat. *Id.* at 17:40. A bottle of air freshener was found in the center console. Govt.'s Ex. 7. Moving to the backseat, he located a backpack on the passenger side, which he opened. *Id.* at 18:00. Prior to touching backpack, the video revealed that the zippers were not closed completely, but were about an inch apart. *Id.* Inside of the backpack, he observed a number of small, green-colored plastic bags. *Id.* The bags had cartoon markings that indicated they contained marijuana or some related cannabis product. *See, e.g.*, Def. Ex. 6. Trooper Mains looked at several other items in the backseat but found nothing else of apparent interest. *Id.* at 18:30.

Returning to speak with Mr. Easley, Trooper Mains disclosed what he had found. Mr. Easley flatly denied that the marijuana and cash were his. *Id*. at 18:45–19:00.

Trooper Mains represented his belief that there was "not a felony amount of marijuana" in the backpack, which Mr. Easley appeared to agree with. *Id.* at 19:10–19:20. He told Mr. Easley that the cash would be seized, and he went to get the items he needed to seize the evidence. *Id.* at 19:20. Trooper Mains then informed Mr. Easley that he would now need to make physical contact by patting Mr. Easley down. *Id.* at 20:20. During the pat down, Trooper Mains found another large wad of cash in Mr. Easley's left pocket. *Id.* at 20:40. He then directed Mr. Easley, who was not in handcuffs, into the back of his squad vehicle. *Id.* at 21:28.

### D. Second Search

With Mr. Easley now waiting inside the squad vehicle, Trooper Mains and Trooper Nelson returned to the Ford to photograph the cash and marijuana on the front and back seats, respectively. *Id.* at 23:00. Moments later, Trooper Nelson, who had moved around to the driver's seat area, where Trooper Mains had not previously searched, called Trooper Mains' attention to a gun on the floor. Trooper Mains inspected the gun and determined that it was a handgun equipped with a "switch," which is an illegal modification that allows a gun to be fired like an automatic machinegun. *Id.* at 24:27. Having found the gun, Trooper Mains returned to his squad vehicle and placed Mr. Easley under arrest. *Id.* at 26:00.

### II.    Legal Standard

A magistrate judge may conduct evidentiary hearings and submit proposed findings of fact and recommended dispositions on motions to suppress evidence. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(1). The district court reviews de novo any

portion of the R&R to which specific objections are made. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b). When conducting such a review of an R&R after the magistrate judge holds an evidentiary hearing, the district court must review the evidence admitted at that hearing, including any transcript of the testimony of witnesses and any video or audio recordings. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008); *Jones v. Pillow*, 47 F.3d 251, 252 (8th Cir. 1995); *United States v. Benitez*, 244 F. App'x 64, 66 (8th Cir. 2007)). The Court is not required to hold its own hearing. *See Mitchell v. United States*, 977 F.2d 586 (8th Cir. 1992); *United States v. Cook*, No. CR 18-04 (DWF/LIB), 2018 WL 4011567 (D. Minn. Aug. 22, 2018).

### III.   Analysis

Mr. Easley filed objections to the R&R. ECF 56. He specifically contests several factual findings. He generally objects to the R&R on the basis that the initial traffic stop was unlawful (*id.* at 4–6); that Trooper Mains unlawfully expanded the traffic stop (*id.* at 6–13); and that the odor of marijuana did not establish probable cause for a vehicle search because it is indistinguishable from the odor of cannabis products that were legal under Minnesota law at the time (*id.* at 13–15). With those objections in mind, the Court addresses the legal bases for the initial stop, the expansion of that stop, and the vehicle search in turn.

### A.  Basis for the Stop

The Fourth Amendment protects against unreasonable searches and seizures, including unreasonable traffic stops. *See United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021). "Under the Fourth Amendment, law enforcement officers may stop a vehicle

if they have an articulable and reasonable suspicion that a traffic violation has occurred, even if the traffic violation is only minor." *United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013) (quotations omitted). Officers may also stop a vehicle if they have probable cause to believe that any traffic violation, even a minor one, has occurred. *Hanel*, 993 F.3d at 543 (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994)). "To determine whether reasonable suspicion exists, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Rederick*, 65 F.4th 961, 965 (8th Cir. 2023) (quotations omitted). It is the government's burden to establish, based on the preponderance of evidence, such probable cause or reasonable suspicion. *See United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006).

Trooper Mains testified that he observed Mr. Easley speaking into his phone while holding the phone to his ear, in violation of Minnesota law. ECF 39 at 9. Counsel for Mr. Easley cross-examined Trooper Mains about whether, from his vantage point in traffic, he would have been able to see Mr. Easley's mouth moving if Mr. Easley was holding a phone in the manner Trooper Mains described. *Id.* at 32. Mr. Easley concedes that his mouth was moving because he was talking on his phone but testified that his phone was resting on his lap. ECF 47 at 22–23. In his objections, Mr. Easley argues that Trooper Mains' testimony lacks credibility because he could not have observed Mr. Easley holding his phone to his face while also observing his mouth moving, given his viewing position in traffic. ECF 56 at 5–6. The R&R concluded otherwise, finding that Trooper Mains gave credible testimony and pointing out some flaws in Mr. Easley's reasoning

regarding hand position, phone placement, and viewing angles in traffic. ECF 54 at 12–13. But Mr. Easley dismisses these findings as being based on "speculation." ECF 56 at 5.

The Court disagrees with Mr. Easley that no evidence supports Trooper Mains' version of events. Instead, the Court concludes that the stop was justified because the record supports that Trooper Mains had at least an articulable and reasonable suspicion that he observed Mr. Easley commit a traffic violation.

At the scene, the bodycam footage of the initial encounter shows that Trooper Mains very quickly indicated to Mr. Easley his reason for pulling him over. Ex. 2 at 1:52 (stating "we can't be on our phone while we're driving"). In the suppression hearing, Trooper Mains gave testimony that he observed a violation of Minnesota's hands-free driving law. Counsel for Mr. Easley pressed Trooper Mains on this point, suggesting that the typical manner of holding a phone, along with the viewing angle in traffic, meant that Trooper Mains could not have simultaneously seen Mr. Easley's mouth moving and Mr. Easley holding his phone in his right hand to the right side of his face. Nevertheless, Trooper Mains maintained a consistent version of his recollections about the stop. *See* ECF 39 at 64 ("It was clear as day ….  He had his arm rested on the center console and had the phone up to his ear. I guess I don't know how to explain it. [Mr. Easley's counsel] had his arm up like this, purposefully blocking his mouth, but that's not the way we all talk on a cell phone.").

In contrast, Mr. Easley testified that although he was speaking on the phone, the phone was in his lap and not in his hand. Under cross-examination, he reiterated that he was not holding his phone in his hand while driving.

First, the Court declines to credit Mr. Easley's argument that it was physically impossible for Trooper Mains to have ever been in a position in traffic such that Trooper Mains could see both a phone in Mr. Easley's right hand and Mr. Easley's mouth moving. In fact, it is easily possible that Trooper Mains saw what he says he saw, based on the various viewing angles that would have been presented as he pulled beside Mr. Easley's Ford. Indeed, rarely while driving on a multiple-lane highway does a person look straight ahead; instead, a driver would be expected to turn his head left and right to assess traffic or check his mirrors or blind spot. Each change in position would give a nearby Trooper a different view of the driver's face.

Second, the question of precisely when Mr. Easey's mouth was moving is somewhat beside the point, aside from its relevance to Trooper Mains' credibility. Based on Minnesota's hands-free driving law, if Trooper Mains observed Mr. Easley holding his phone to his ear, with or without seeing his mouth moving at that moment, then the officer had at least reasonable, articulable suspicion that a traffic violation had occurred, and he was therefore justified in making his stop.

Finally, the Court agrees with Judge Foster that Trooper Mains' testimony was credible, on this point and generally. Of course, this Court does not deny that a law enforcement officer might purposefully lie about facts in order to sustain a prosecution. Likewise, the Court acknowledges that a criminal defendant may do the same, in hopes of

suppressing crucial evidence. But here, the Court concludes that Trooper Mains observed a traffic violation in the manner he described, based on the full balance of available evidence. Not only does the transcript reflect straight-forward credible testimony and Judge Foster found Trooper Mains to be credible on the stand, but several surrounding facts support the conclusion.

First, Trooper Mains' nearly immediate statement upon approaching Mr. Easley's vehicle was that "we can't be on our phone while we're driving." This is strong, facial support that Trooper Mains believed he had observed a violation of Minnesota hands-free driving law. Indeed, Trooper Mains made this statement before he learned that the Ford Mr. Easley was driving was a long-term rental (one of the factors that Trooper Mains later considered in justifying his expansion of the stop) and early enough that it is reasonable to believe that Trooper Mains had not yet noticed odors or behaviors that he said fed into his eventual suspicions of unrelated criminal conduct. This order of events cuts against any argument that Trooper Mains lacked an initial, lawful basis for the stop and was merely backfilling a justification in order to look for contraband.

Second, Mr. Easley notably makes no response at the scene to Trooper Mains' statement about him being on the phone and Minnesota being a "hands-free state." Mr. Easley testified that he did not do so because at the time, he did not know that holding and speaking on a phone while driving was a violation of Minnesota law and because he therefore did not understand the purpose of Trooper Mains statement. ECF 47 at 41–42. But if Mr. Easley truly had no knowledge that holding his phone was a traffic violation, it is somewhat difficult to credit his later certainty that he was not holding his phone before

he was stopped. Such certainty is more consistent with a person who is consciously avoiding a violation of a law. Moreover, Trooper Mains explained the rationale for the stop further when he referenced Minnesota being a "hands-free state," which would have made it even more likely that Mr. Easley would deny holding his phone if he hadn't been doing so. Mr. Easley's silence in response to Trooper Mains' statement about using his phone while driving is also notable in its contrast to later moments during Mr. Easley's stop, where he is able and willing to engage and advocate on the finer points of Minnesota criminal law. Ex. 2 at 16:30 (arguing that Trooper Main's lacks a credible basis to search his vehicle based only on the odor of air freshener); *id.* at 19:15 (agreeing that the backpack found on his backseat did not contain felony amounts of marijuana). Viewed in context, the Court is persuaded that Mr. Easley's silence in response to Trooper Mains' statement about being on his phone is indicative that Mr. Easley understood he was being stopped for a traffic violation and saw no reason to question it.

Accordingly, the Court finds that Trooper Mains possessed at least an articulable and reasonable suspicion, and likely full probable cause, that Mr. Easley had committed a traffic violation and overrules his objections on the lawfulness of the initial stop.

### B. Expansion of the Stop

Even when police have lawfully stopped a vehicle, the stop can become unconstitutional if it is unreasonably extended or prolonged. *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021). When officers have observed a traffic violation, a traffic stop becomes unlawful "if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*,

575 U.S. 348, 350–51 (2015) (cleaned up). This mission generally includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355; *see also United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) ("[A]n officer may detain the occupants of a vehicle … while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, including running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their 'destination, route, and purpose." (internal quotations omitted). "[L]aw enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 357). And an officer may lawfully extend a traffic stop if the officer develops reasonable suspicion of criminal activity during the course of the encounter. *Rodriguez*, 575 U.S. at 355. "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Magallon*, 984 F.3d at 1278 (quotation omitted). "The suspicious facts must be specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted." *Id.* (quotation omitted).

Judge Foster concluded that Trooper Mains developed sufficient reasonable suspicion of drug-related activity to warrant extending the initial traffic stop into an investigatory stop because: three cell phones were visibly present in the front seat; the

Ford smelled of air freshener; a reasonable officer could have perceived Mr. Easley's delayed response as to why he was driving a long-term rental vehicle suspicious; and the Ford began to smell of marijuana after the air freshener began to fade. ECF 54 at 14–15. Mr. Easley objects to each basis and reiterates his argument that the stop was unlawfully expanded. ECF 56 at 6–13. For the following reasons, the Court finds that Trooper Mains lawfully expanded the stop based on a reasonable suspicion of criminal activity. *Rodriguez*, 575 U.S. at 355.

### *Initial encounter*

The bodycam footage and the testimony at the hearing confirm that Trooper Mains' initial encounter with Mr. Easley—the questions he posed to Mr. Easley at that time and the documents he requested—comprised routine activity, reasonably directed toward completing his mission. Trooper Mains asked for Mr. Easley's driver's license and his proof of insurance. He asked Mr. Easley if he was from the area, which was understandable in light of the Florida license plate on Mr. Easley's vehicle. He asked for a copy of the rental agreement for the vehicle that Mr. Easley was driving. He asked where Mr. Easley was coming from and where he was heading to. And he inquired why Mr. Easley was driving a rental car. Once Mr. Easley responded to Trooper Mains' questions and provided the requested documents, Trooper Mains went back to his squad vehicle to run a criminal history check on Mr. Easley, look up his license, and check for warrants. He then entered some information about his observations from his initial approach to the Ford into his computer. All the above, which together took approximately

six-and-a-half minutes, are the kind of "routine but somewhat time-consuming tasks" that are inherently reasonable during a traffic stop. *Murillo-Salgado*, 854 F.3d at 415.

### Investigatory expansion

The next steps taken extended the stop and require additional justification beyond the initial traffic violation. Trooper Mains' discussions about Mr. Easley with a fellow trooper, ordering of Mr. Easley to exit the Ford, and the additional questions he asked him on the roadside all represent an investigatory expansion of the stop beyond the sorts of routine tasks described in *Murillo-Salgado*. The nature of the stop had clearly shifted upon the arrival of Trooper Nelson, and it is clear that Trooper Mains had decided to search the vehicle. Trooper Mains and his colleague discuss the significance of Mr. Easley's prior arrests and his criminal history. They discuss the fact that he is driving a rental car. Trooper Mains then indicates that he is considering "the best way to get him out" of the Ford, given dangerous traffic conditions around the vehicles. At this point, there can be no doubt that Trooper Mains intended to prolong and expand the stop beyond addressing the underlying traffic violation. The Court concludes that Trooper Mains had reasonable suspicion for the additional investigative steps.

Trooper Mains testified that he became suspicious during the initial encounter for several reasons. There was a strong odor of air freshener coming from inside the Ford, which he said in his experience can be used to cover up the smell of drugs. ECF 39 at 11. Mr. Easley was a Minnesota resident driving a long-term rental, which he said was a sign of potential drug trafficking, and appeared somewhat evasive to questions about why he was doing to. *Id.* at 13-14. Mr. Easley appeared very nervous, including a pulsating

stomach that was indicative of an elevated heart rate. The Trooper testified that he

observed several cell phones in the Ford, which he said was also indicative of criminal

activity. *Id.* at 14–15. And finally, he had faintly smelled marijuana mixed with the heavy

scent of air freshener when he first approached the Ford (*id.* at 18).

With limited exceptions, the Court finds these observations established a

reasonable articulable suspicion that justified expansion of the stop. It is not disputed that

Trooper Mains had quickly determined that Mr. Easley was driving a rental car. And after

Trooper Mains initially approached the Ford and returned to his own vehicle, one of his

first actions was to enter a note into his computer, stating that he had observed a "strong

odor" of air freshener, had seen two cell phones, and smelled a "slight odor" of

marijuana. Ex. 2 at 7:20. This notation is consistent[1] with the testimony he later provided,

---

[1] During the suppression hearing, Trooper Mains testified to seeing multiple phones in
the Ford. ECF 39 at 14. Mr. Easley likewise testified that he had four phones in the
vehicle when he was stopped, three of which would have been visible to Trooper Mains.
ECF 47 at 25. Bodycam footage clearly shows three phones are visible during Trooper
Mains' initial encounter at the vehicle, with one phone sliding from Mr. Easley's lap onto
the floor shortly after Trooper Mains arrived. Ex. 2 at 1:35–1:49. However, Trooper
Mains conceded that he had written about only "two cell phones" in his notes at the
scene. ECF 39 at 47. He testified that this discrepancy was the result of a "typo" and that
he had, in fact, observed three phones. *Id*. Mr. Easley objects to the R&R's conclusion
that this discrepancy was an immaterial confusion on Trooper Mains' part. ECF 56 at 6–
7. Mr. Easley argues that the difference between seeing two phones versus multiple
phones is significant because had Trooper Mains seen only two phones, it should not
have aroused suspicion. *Id.* at 7 ("Trooper Mains suspicions would not have been aroused
had he encountered a white man in a suit with two cell phones, even if he was driving a
rental car. Reasonable suspicion should not be a proxy for racial profiling."). The Court
agrees that the presence of two phones is certainly less suspicious than three or four
phones. However, there *were* three phones plainly within Trooper Mains' sight, as
evidenced by the bodycam footage. Trooper Mains' notations about his observations are
informal and contemporaneous notes and were made while he was multitasking. Some

(*footnote continued on next page*)

explaining his growing suspicion of drug-related criminal activity. Therefore, the record shows that, immediately following his initial encounter with Mr. Easley, Trooper Mains was aware that Mr. Easley was driving a rental vehicle, and had credibly observed multiple phones, the heavy smell of air freshener, and the mild smell of marijuana coming from the vehicle. Each of these observations are specific and articulable suspicious facts which, taken together with reasonable inferences, amount to reasonable suspicion that further investigation was acceptable. *See United States v. Brtek*, No. 20-CR-79 (DWF/TNL), 2021 WL 773029, at *10 (D. Minn. Jan. 20, 2021) (factoring officer testimony that rental vehicles are often used in drug trafficking into reasonable suspicion analysis for expansion of valid traffic stop), *R&R adopted by* No. 20-CR-79, 2021 WL 766855 (D. Minn. Feb. 26, 2021); *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) (multiple phones typically carried by drug traffickers to avoid detection); *United States v. Jiminez*, 487 F.3d 1140, 1144 (8th Cir. 2007) (same); *United States v. Noriega*, 35 F.4th 643, 650–51 (8th Cir. 2022) (strong fragrance coming from defendant's vehicle caused officer to reasonably suspect that an air freshener had been sprayed to mask the scent of narcotics); *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) (faint smell of marijuana, along with the credible testimony of the officer,

---

amount of imprecision or error is therefore reasonable. The note clearly captures Trooper Mains' immediate state of mind, which is shown to be focused on three things: air freshener, phones, and marijuana. As a result, the Court finds credible Trooper Mains' explanation that he was suspicious based on his observation of multiple phones in the vehicle.

sufficient to establish reasonable suspicion to detain a driver and probable cause to search the vehicle).

The Court parts ways with the R&R in two respects, though neither is outcome determinative. First, Trooper Mains also testified that Mr. Easley appeared so nervous that his stomach was visibly pulsating, thereby increasing his suspicion of criminal activity. ECF 39 at 14. Bodycam footage neither contradicts nor supports this contention, and there can be little doubt that both the officer and Mr. Easley had a clearer view than that captured on film. But Mr. Easley's outward demeanor in the footage, especially during the earlier moments of the encounter, seems to be relatively relaxed and his tone and responsiveness do not appear to be that of a person whose heart is racing so fast that his stomach is pulsating. For his part, Mr. Easley flatly denies that he was experiencing intense and visible nervousness. ECF 47 at 25. "Nervousness combined with several other more revealing facts can generate reasonable suspicion," but in general, "nervousness is of limited significance" to this analysis. *United States v. Jones*, 269 F.3d 919, 928. (8th Cir. 2001). The Court agrees, and declines to assess Mr. Easley's nervousness as a factor supporting extending the traffic stop into something more.

Second, the Court addresses Trooper Mains' stated observation of evasiveness and its role in developing his suspicions. During the initial encounter with Mr. Easley, and upon learning that the Ford was a rental, Trooper Mains asked Mr. Easley if his own car was in the shop. Ex. 2 at 2:58. Mr. Easley made an inaudible reply, and Trooper Mains repeated the question one time. *Id.* at 3:03. Then, apparently satisfied with Mr. Easley's subsequent answer, Trooper Mains asked no further questions and returned to his squad

vehicle. Trooper Mains later testified that he "had to ask [Mr. Easley] multiple times" about his reasons for having a rental, and that it "seemed like he was kind of thinking of an answer" and that he "eventually just told me that he borrows his girlfriend his car sometimes." ECF 39 at 14.

Trooper Mains may have indeed felt that Mr. Easley was being evasive, but this Court disagrees that the video evidence objectively supports this inference. First, the Court notes that Trooper Mains did not actually ask Mr. Easley "why he was driving a rental car" initially. In fact, he asked "is your car in the shop." Ex. 2 at 2:58. This is somewhat of a non-sequitur, and the Court can understand why Mr. Easley may have been confused and therefore not immediately responsive. It was after Trooper Mains repeated the question that he clarified that he was asking why Mr. Easley was driving a rental vehicle. The bodycam footage also shows the question would have been difficult to hear because Trooper Mains was standing by the passenger-side door while traffic was moving on both sides of the Ford and while the roads were noisy from wet, melting snow. Finally, the entire exchange lasted a little over 10 seconds, which is not consistent with a prolonged exchange in which a suspect is struggling to form answers. Given this evidentiary record, the Court also declines to assess Mr. Easley's evasiveness as a factor supporting extending the traffic stop into something more.

### *Further questioning*

When Trooper Mains returned to the Ford for his second encounter with Mr. Easley, he was by now aware that Mr. Easley was driving a rental vehicle, and he had observed multiple phones, the heavy smell of air freshener, and the mild smell of

marijuana coming from that vehicle. The Court concludes that it was reasonable at this juncture for Trooper Mains to further investigate his suspicions around a drug-related crime. Trooper Mains did so by instructing Mr. Easley to exit the vehicle for questions. After Mr. Easley exited, Trooper Mains asked him a series of questions directed mostly to whether drugs or other contraband were in the vehicle. He asked Mr. Easley about the air freshener he had smelled, and he told him he was certain he had also smelled marijuana when he first approached. These questions, and the time they required to answer, were reasonably within the scope of an expanded traffic stop, predicated on the reasonable suspicion discussed above.

The Court also finds that during this reasonable expansion of the stop, when Trooper Mains returned to the Ford and began to question Mr. Easley on the roadside, Trooper Mains encountered further facts supporting reasonable suspicion to perpetuate the stop. One of those facts was his observation of a wad of cash in Mr. Easley's pocket. ECF 39 at 21–22 (Trooper Mains testifying that he observed a "very large" rubber-banded wad of cash poking out of Mr. Easley's pocket while speaking with him outside the vehicle and credibly explaining why he associated this with potential drug trafficking). Mr. Easley denies that Trooper Mains saw cash in his pocket and argues that the bodycam footage "disprove[s]" that he could have. ECF 50 n.1. However, the Court agrees with the R&R's conclusion that the footage corroborates Trooper Mains' testimony: Trooper Mains' statement to Mr. Easley asking him to confirm that there was "nothing on you, besides cash" (Ex. 2 at 16:15) is consistent with Trooper Mains' testimony that he had noticed cash in Mr. Easley's pocket. And Mr. Easley did not refute

that aspect of the question or say "what cash?" as might be expected if he was certain none was visible. The observation of a large quantity of cash, while not illegal in isolation, was another indicator that contributed to Trooper Mains' reasonable suspicion to believe that Mr. Easley was engaged in some kind of criminal activity related to drugs. But the most pertinent fact was the persistent smell of marijuana, which Trooper Mains later explained to Agent Flannagan had grown between the first and second encounter at the Ford. *Id.* at 36:10 (explaining that when he returned to the car for the second encounter, the smell of air freshener had begun to dissipate, and the odor of marijuana was more noticeable).

Accordingly, the Court overrules Mr. Easley's objections regarding the lawfulness of the expanded stop and agrees with the R&R that it provides no basis for suppression of evidence.

### C. Vehicle Search

A warrantless search is per se unreasonable under the Fourth Amendment unless an exception to the warrant requirement applies. *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020). The automobile exception allows officers to conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband or evidence of a crime. *United States v. Kennedy*, 427 F.3d 1136, 1140–41 (8th Cir. 2005); *United States v. Evans*, 830 F.3d 761, 767 (8th Cir. 2016).

The R&R found that Trooper Mains had probable cause to conduct a warrantless search of the Ford based on the same indicators of potential drug activity that supported the expanded stop and based on three additional observations he made during that

expanded stop: a wad of cash in plain view in Mr. Easley's pocket after he exited the

vehicle, the implausibility of Mr. Easley's explanation while standing on the roadside for

why his car smelled of air freshener, and the continuing smell of marijuana. ECF 54 at

17–18.

Mr. Easley focuses his objections to the finding of probable cause for a vehicular

search around the odor of marijuana. ECF 56 at 13–15. Specifically, Mr. Easley argues

that Trooper Mains did not smell marijuana before the search.[2] ECF 56 at 10–11. In the

alternative, he argues that the odor of marijuana could not have supported probable cause

to believe Mr. Easley's Ford contained contraband because the odor of illegal marijuana

is indistinguishable from that of other cannabis products that were somewhat recently

legalized in Minnesota at the time Mr. Easley was stopped. *Id.* at 13 ("[T]he most

[Trooper Mains] could say is he recognized the odor of cannabis, which could have been

legal medicinal marijuana or a legal CBD product, or illegal recreational marijuana.").

Under binding Eighth Circuit precedent in effect at the time of the stop, the smell of

---

[2] Mr. Easley also testified that the marijuana was stored in a backpack specifically designed to keep odors from escaping, and a sample of the backpack was introduced into evidence. *See* ECF 47 at 32-36; Defendant's Exhibit 10. However, the Court credits the R&R's conclusion that the presence of the special bag does not undermine Trooper Main's testimony. First, the Court agrees with the R&R that the bodycam footage appears to shows that the backpack containing many smaller baggies of marijuana was slightly unzipped at the time Trooper Mains picked it up and opened it completely. Ex. 2 at 18:00. Moreover, as Agent Flanagan credibly testified, the plant's resins may have been transferred to outside the bag, causing the smell to linger. ECF 39 at 72-73. And the presence and recent use of air freshener somewhat undermines that flat assertion that no marijuana smell could have been detected: the use of air freshener to conceal the smell of marijuana is well known.

marijuana, however faint, establishes probable cause to search a vehicle. *Smith*, 789 F.3d at 929; *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception."). Mr. Easley urges the Court to depart from such precedent. ECF 56 at 15. For the following reasons, the Court concludes probable cause existed to search his vehicle, and Mr. Easley's objections on this issue are overruled.

### *The odor of marijuana*

As discussed above, the Court has concluded that Trooper Mains had already observed the odor of marijuana when he stood outside of the Ford. Mr. Easley argues that Trooper Mains could not have smelled marijuana before the search. ECF 56 at 10–11. But Trooper Mains' second encounter at the vehicle, his subsequent questioning of Mr. Easley, and other statements made later at the scene, all further support that Trooper Mains credibly observed the smell. First, bodycam footage shows that Trooper Mains told Mr. Easley during the second encounter that he thought he smelled marijuana in the car when he first approached, and he asked him a number of questions directed toward whether he would find any inside. *See* Ex. 2 at 14:55–16:05. Second, Trooper Mains emphasized the smell of marijuana when Agent Flannagan later asked him why he searched the vehicle. *Id.* at 36:10 (explaining that when he returned to the car for the second encounter, the smell of air freshener had begun to dissipate and the odor of marijuana was stronger). Third, when Agent Flannagan first arrived, he rapidly noticed the smell arising from the backpack. Ex. 2 at 35:15 (interjecting "oh Jesus, it smells like

weed!" while greeting his colleagues). Although the backpack was by now fully opened, this spontaneous statement supports the notion that the marijuana inside was omitting a powerful odor that could have easily been noticed by Trooper Mains earlier.

In his objections, Mr. Easley attempts to discredit the contention that Trooper Mains smelled marijuana before the vehicle search and rejects the R&R's conclusion that he did. ECF 56 at 10–11. The Court declines to rebut each of Mr. Easley's arguments individually, because based on its own review of the record, it is independently satisfied that Trooper Mains did smell marijuana. In essence, what Mr. Easley asks is for this Court to believe that the backpack in Mr. Easley's backseat that was in fact full of marijuana could not possibly have smelled like marijuana, and that Trooper Mains lied repeatedly about the odor to justify his search and got lucky after the fact. The Court is not persuaded.

In an alternative argument, Mr. Easley urges the Court to depart from Eighth Circuit precedent on marijuana and probable cause for vehicle searches because his stop occurred in February 2023, when certain hemp-based cannabis products were legal under Minnesota law. *Id.* at 13–15. Mr. Easley urges that, even if Trooper Mains smelled marijuana coming from the Ford, the odor was indistinguishable from that of legal cannabis products and therefore could not have informed Trooper Mains' probable cause to believe the vehicle contained contraband. *Id.* In support of this position, Mr. Easley relies in part on expert testimony from Dr. George Weiblen, a University of Minnesota botany and genetics professor with extensive experience studying cannabis. ECF No. 47 at 4–6. Dr. Weiblen credibly testified that there is no difference between the smell of

24

illegal marijuana and legal hemp plants, whether in raw or burnt forms. *Id.* at 9. Notably, Agent Flanagan, who testified for the Government as an expert witness on cannabis, also testified that illegal marijuana and legal hemp odors can be indistinguishable. ECF 39 at 78.

The legal status of the recreational use of marijuana and other cannabis products has shifted dramatically in Minnesota in recent years. In summer 2022, the state legalized certain hemp-derived cannabis products containing the high-inducing ingredient THC. *See* Ryan Faircloth, *Edibles, beverages infused with cannabis ingredient THC become legal Friday in Minnesota*, Minneapolis Star Tribune (June 30, 2022, https://www.startribune.com/edibles-and-beverages-laced-with-cannabis-ingredient-thc-to-become-legal-friday-in-minnesota/600186638/). In summer 2023, the state went a step further and legalized the recreational use of marijuana itself. *See* Ryan Faircloth, *Gov. Tim Walz signs historic bill legalizing marijuana in Minnesota*, Minneapolis Star Tribune (May 30, 2023, https://www.startribune.com/walz-signs-bill-legalizing-marijuana-in-minnesota-cannabis-legal-weed-midwest-states/600278668/). Against this backdrop, Minnesota's courts have begun to reconsider the role that an officer's observation of the smell of marijuana can play in establishing probable cause for warrantless vehicle searches. *State v. Torgerson*, __ N.W.2d __, 2023 WL 5944620 at *8 (Minn. Sept. 13, 2023) (holding that the odor of marijuana, on its own, is no longer sufficient to create probable cause to search a vehicle in Minnesota under the automobile exception to the warrant requirement).

The decisions of Minnesota's courts regarding the probable cause standard for a warrantless vehicle search are not binding on this Court. However, because significant changes in Minnesota law have legalized previously illicit substances, this Court will likely encounter a case in which the justification for a search can no longer be predicated on the smell of a product that is no longer contraband. But this is not that case.

At the time of Mr. Easley's arrest, marijuana itself remained illegal. The fact that the odor produced by hemp and marijuana is identical was of questionable relevance to the probable cause question presented when Trooper Mains observed that odor. As explained above, probable cause is not based on "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence." *Harris*, 568 U.S. at 243. Instead, it is based on "a practical, common-sense decision whether … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. In other words, Trooper Mains did not need to develop absolute certainty as to whether he was smelling legal hemp or illegal marijuana to develop probable cause to believe he was smelling the latter. More critically, the records contains no evidence that the 2022 legal edible products and beverages containing THC derived from hemp (as opposed to hemp plants themselves) actually smell like marijuana. Further, the aggregate set of facts observed by Trooper Mains contributed to his probable cause to believe that the car could contain contraband evidence of drug trafficking or transportation, which remains a crime in Minnesota, rather than evidence of mere recreational possession or use of THC edibles or beverages. The phones, the cash, the car rental, and the air freshener all support such an inference.

For these reasons, the Court concludes that the search of the vehicle did not violate Mr. Easley's Fourth Amendment rights. Because the initial stop was valid, the stop was not unreasonably expanded or prolonged, and the warrantless search of the vehicle was justified under the automobile exception, Mr. Easley's motion to suppress evidence is denied.

## IV.    Order

Based on the discussion above, **IT IS HEREBY ORDERED THAT** Mr. Easley's Objections, ECF 56, are overruled; the Report and Recommendation, ECF 54, is accepted; and the Motion to Suppress Search and Seizure, ECF 28, is denied.

Date: October 20, 2023

_s/Katherine Menendez_
Katherine Menendez
United States District Judge